**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| AMERICAN FRAME CORPORATION<br>400 Tomahawk Drive<br>Maumee, Ohio 43537,<br><br>    Plaintiff,<br><br>  vs.<br><br>HUMAN ELEMENT, INC.<br>617 Detroit Street<br>Ann Arbor, Michigan 48104,<br><br>    Defendant. | Civil Action No.<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

American Frame Corporation ("American Frame" or "Plaintiff"), by and through the undersigned counsel, and in support of this Complaint against Defendant Human Element, Inc. ("Human Element" or "Defendant"), does hereby allege and aver as follows:

### NATURE OF THE ACTION

1. Plaintiff American Frame entered into a Master Services Agreement ("MSA") with Human Element to build, install, implement, launch, and to keep safe and secure a new-build website platform for American Frame. To induce American Frame to enter into the nearly half-million dollar contract, Human Element represented itself as possessing the "skills and expertise"—specializing in the very Adobe Commerce platform American Frame sought to have its website built on. After completing a months-long and expensive "discovery" phase into American Frame's business and its website needs, Human Element's proposal for the project was estimated at $411,350 with a projected launch within five months. Ultimately, launch was delayed

by nearly a year, the project's alleged cost nearly doubled by launch, and the site was launched with significant bugs and problems which have caused significant harm to American Frame's business, including a cyber-security incident resulting from Human Element's negligence in properly securing the site, after which Human Element did not take adequate remedial measures, causing further harm and exposure to American Frame.

2. Plaintiff American Frame brings this action to recover damages caused by Defendant Human Element's fraudulent and negligent inducement, its subsequent material breach of contract, and violation of the Ohio Deceptive Trade Practices Act, R.C. § 4165.02, *et seq.*, arising from Defendant's unlawful conduct.

## PARTIES

3. Plaintiff American Frame is a corporation organized and existing under the laws of Ohio with its principal place of business located at 400 Tomahawk Drive, Maumee, Ohio, 43537.

4. American Frame is in the business of manufacturing and selling custom picture frames, picture frame kits and supplies, and offering full-service custom print and framing services.

5. Upon information and belief, Defendant Human Element, Inc. is a Michigan corporation with its principal place of business located at 617 Detroit Street, Ann Arbor, Michigan 48104.

6. Upon information and belief, Defendant is an eCommerce web development company claiming to have expertise, rooted in technology, in custom website development, digital marketing, user experience design, and eCommerce strategy.

**JURISDICTION AND VENUE**

7. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1332 because the action concerns citizens from different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

8. This Court has *in personam* jurisdiction over Plaintiff American Frame because American Frame is a corporation registered in this state and regularly conducting business in this state and in this district and division.

9. This Court has *in personam* jurisdiction over Defendant Human Element because Human Element is a corporation regularly conducting business in this state and in this district and division, the Parties contracted that the MSA be governed by the laws of this State, and Human Element caused injury within this judicial district and division.

10. Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 in that Defendant is transacting business in this district, and because a substantial part of the events giving rise to American Frame's claims occurred in the Northern District of Ohio.

**STATEMENT OF FACTS**

**A. American Frame's History and Website.**

11. American Frame is a family-owned and operated business with its manufacturing, assembly, and customer service all located in Maumee, Ohio. American Frame was founded by Ron Mickel, who later sold the company to his two daughters: Laura Jajko and Dana Dunbar. Today, American Frame is a 100 percent women-owned, American-based, business.

12. American Frame traces its roots to ASF Sales, the first do-it-yourself ("DIY") frames-by-mail company starting in 1973. The name of the company was changed to American Frame Corporation in 1983. With nearly 50 years of experience selling custom picture frames by

3

mail directly to customers, American Frame is an established and successful company in the picture framing industry, particularly among professional artists.

13. With the advent of the internet, what once was an order-by-mail service became a DIY framing eCommerce site at www.americanframe.com ("American Frame Website"), where customers can design and order custom frame treatments, as well as engage American Frame's print services of the customer's image(s). American Frame's reputation for high quality picture frames and excellent customer service enables its customers to confidently shop online for custom picture frames and related products delivered directly to their homes and studios.

14. For decades, American Frame grew and expanded its business. American Frame sells custom picture frames and related goods and services across the United States. The vast majority of American Frame's business comes from sales through the American Frame Website.

15. American Frame has expended substantial funds in marketing its products and developing the associated goodwill that now accompanies the American Frame Website. Up until recently, American Frame has been highly successful in promoting the online sale of picture frames and related goods and services.

**B. Defendant Human Element Induced American Frame to Enter into MSA.**

16. In 2019, American Frame sought to evolve the American Frame Website to its next generation of usability, scalability, security, and tax compliance.

17. Defendant Human Element was identified as a potential developer for this project. American Frame had worked with Human Element from 2006-2008, Human Element having designed and built a user experience that had performed well for American Frame based on its size and needs at the time.

18. Human Element represented itself as having grown and expanded its capabilities to handle taking the American Frame Website to the next level. On its website, Human Element states that its "expertise, rooted in technology, spans custom website development, digital marketing, user experience design, and eCommerce strategy," claiming that "our team of commerce pros will elevate your brand to the next level of eCommerce through impactful architectures that convert." (Website screenshot attached as Exhibit A).

19. Human Element provided a proposal to American Frame touting its "skills and expertise," as a "Silver" level Adobe Solution Partner specializing in the Adobe Commerce platform (Magento), to conduct discovery into American Frame's website needs and then to build, install, implement, launch, and keep safe and secure an entirely new website platform on Magento for the American Frame Website.

20. American Frame specifically asked Human Element by email: "How will Human Element measure the success of this project? What KPIs [Key Performance Indicators] will you be looking at?" Human Element responded: "We develop KPIs during the design process that align with your own metrics. General [sic] we look at overall traffic, organic and PPC, specific key word traffic, AOV, conversion rate and overall revenue." (Mar. 9, 2020 Email attached as Exhibit B).

21. These representations made by Human Element were material to American Frame.

22. Based on Human Element's representations regarding its "skills and expertise," American Frame engaged Human Element to conduct discovery into American Frame's "system and business needs and goals," and in parallel to begin to build, install, implement and launch an entirely new website platform. In other words, Human Element was not having to "fix" any old

5

code of the American Frame Website, such that there should have been very few (in any) bugs in its own newly built site.

23. American Frame is a customer-facing business, and its website is the primary way that American Frame interfaces with its customers. Therefore, American Frame was willing to make a significant investment to ensure that it could offer a first-class eCommerce experience to its customers.

24. American Frame thus wanted to hire an experienced web developer to ensure that the developer had the expertise and experience to make American Frame's investment worthwhile. Human Element misrepresented itself in this regard.

**C. The MSA Requires Human Element to Build a "Next Level" eCommerce Site and Human Element Fails, Resulting in Breach of the MSA.**

25. On October 16, 2019, American Frame entered into a Master Services Agreement ("MSA") with Human Element. (Attached as Exhibit C). The MSA required Human Element to conduct "New Website Platform, Discovery, Implementation & Launch of americanframe.com", as more specifically defined in a series of "Statements of Work" ("SOW") executed by both Human Element and American Frame.

26. The First SOW (attached as Exhibit D) consisted primarily of a "discovery" phase for Human Element to conduct discovery into American Frame's "system and business needs and goals," and in parallel to begin to build, install, implement and launch an entirely new website platform.

27. In February 2020, based on the "discovery" by Defendant, Human Element submitted to American Frame a "New Build Website Proposal." (Attached as Exhibit E). The proposal set out the purpose: "Want to introduce a new ecommerce site and needed to first

6

understand the high level of the overall technology system *so when a new website is introduced, business function isn't interrupted.*" (Emphasis added).

28. On March 24, 2020, based on Human Element's "discovery" phase over the preceding five months, and based on further representations and recommendations by Human Element, the parties executed SOW 2 (attached as Exhibit F) for the new website platform project to get the American Frame Website on the "latest stable version" of Magento.

29. In SOW 2, Human Element quoted the cost for the work included through launch of a responsive website at $411,350, with a projected launch date in Month 5 (August 2020).

30. American Frame believed this to be an aggressive schedule, but relied on Human Element's expertise, extensive months-long discovery into American Frame's then-current systems, and confidence that with Human Element's "iterative" (as opposed to linear) development process and Human Element's purported "experts" working simultaneously on different modules of the site, this was doable.

31. Under SOW 2, Human Element was to deliver an optimized and responsive website to American Frame, including a promise to "define and build the identified list of in-scope features, test and launch the website", within five months (August 2020) at a cost of $411,350.

32. American Frame immediately took and submitted Human Element's proposal to its financial partner, Signature Bank, for support and approval at $411,350. The work was approved and purportedly began shortly thereafter.

33. By June 2020, it was clear that the August 2020 launch date would not be reached, and so American Frame agreed, reluctantly, to push the launch date back to October 2020. Based on this new delivery date, promised by Human Element, American Frame still expected delivery

7

of its new site in time for its busiest season and, in reliance on that promise, made appropriate preparations.

34. By August 2020, very little progress had been made, and it was again clear that Human Element was not going to deliver on time, as promised, and that the site would not launch in the fall of 2020.

35. Throughout the remainder of 2020 and well into 2021, Human Element continued to move the launch date back. For example, in May 2021, Human Element projected the site to go live on June 8, 2021, but again, the launch date was missed because Human Element had failed to implement a shipping solution that would calculate the fees and oversize fees associated with framed art—essentially American Frame's entire business model, which would have been evidence from Human Element's "discovery" phase.

36. On August 24, 2021, an entire year later than proposed, the site eventually launched; however, the site was launched with an excessive amount of performance issues and bugs that continue to require attention through present, and which have cost significant and irreparable harm to American Frame's profits, goodwill, and reputation.

37. Moreover, with the additional time that it took Human Element to complete the site, it likewise sought additional money—an approximately 80 percent increase over the original estimate—to accomplish the original deliverables.

38. The total purported liability at launch was $814,505 – more than $400,000 over (and almost double) the original quote.

39. On December 1, 2021, American Frame entered into yet a third SOW (attached as Exhibit G) to upgrade its site to Magento 2.4.3 (represented by Human Element as the "latest stable version"). The remainder of the SOW related to testing and "bug fixes" to American Frame's

brand new, but defective, site, and custom deliverables, such as American Frame's "Frame Builder," custom pricing, and shipping.

40. The estimated cost for the third SOW was $24,800.

41. Despite Human Frame's representation that version 2.4.3 was the "latest stable version" of Magento, American Frame later learned that version 2.4.3 would be obsolete by November 2022, and was later advised by Adobe that Human Element should have upgraded American Frame directly to version 2.4.4, resulting in as much as $30,000 of unnecessary upgrade costs paid to Human Element.

42. Pursuant to each SOW, if the project allegedly required hours in addition to those quoted as part of the SOW, Human Element was supposed to issue a Change Request, to be approved and signed by American Frame prior to any additional work being authorized. Specifically, as per the terms of the MSA and SOWs, American Frame understood that it was not responsible for any unapproved additional hours (i.e., any costs above and beyond the $411,350 that were not accompanied by a sign Change Request), particularly those quoted in order to fix issues caused by Human Element's lack of expertise.

43. Notwithstanding its own process, Human Element only issued one "no-charge" Change Request for the overrun in hours caused by Human Element fixing and re-fixing its own work. Also, in this no-charge Change Request, Human Element sought approval for the elimination of certain features originally listed in the SOW to try to improve the launch date, while also adding some other features as a compromise, dated December 4, 2020. (Change Request attached as Exhibit H).

44. Human Element did not follow contracted procedures to remove items for the scope of work.

45. It has since become clear that Human Element's "iterative" approach has resulted in a disorganized amalgamation of deliverables, unnecessary burning of contracted hours, unilateral changes to the scope of work being provided, and an overall stray from the document SOWs.

46. American Frame has repeatedly raised these concerns with Human Element, but the American Frame Website continues to suffer from numerous flaws. The following is a representative sample (not an exhaustive list) of how the delivered site falls materially below what was promised in the MSA and SOWs, including lacking critical basic features and in-scope deliverables:

    a. mobile usability and page speed issues that affect rankings and customer experience;

    b. critical basic features such as accurate shipping calculations and shipping extension integration, making shipping notifications a manual process;

    c. inability to implement the Avalara software in a timely manner resulting in approximately $166,000 in additional uncollected state sales tax liability;

    d. the site is heavy in JavaScript, slowing the site and affecting rankings, which will require rework that should have been handled in the initial build;

    e. several months of lagging organic improvement related to code 500 server errors being generated inadvertently out of Magento and buried in Human Elements' code, causing mobile usability issues, redirect issues related to disabled product (requiring manual deletion and rewrites), and lingering issues in Google;

    f. non-scalable, manual process for settling daily sales from Magento to the accounting system – requiring a person manually click on each and every order to get it to process (less efficient that American Frame's prior website);

    g. having to disable product reviews because they were generating code 500 server errors, impacting SEO for many months;

    h. inability to work from .tiff files, necessary to offer image handling services and frustrating American Frame customers thus diminishing its brand;

    i. problems with color on uploaded image files reversing colors and giving customers the impression that American Frame's systems cannot read digital files correctly;

    j. print and frame interface malfunctioning;

    k. inability to implement sales prices; and

    l. inability to simply and accurately issue a credit memo for nearly a year after launch.

47. These and other issues do not meet the requirements of the MSA and/or are not industry standard.

48. To date, American Frame has paid Human Element more than $1 million for this work, but Human Element has failed to comply with its contractual obligation. Despite multiple opportunities to correct these numerous deficiencies, Human Element has been unable to deliver a debugged, optimized and responsive site with the features and security that it agreed to deliver.

**D. American Frame Suffers a Cyber-Security Incident Resulting From Human Element's Misconduct, Breach, and Negligence.**

49. As the final straw in American Frame losing all trust and confidence in Human Element's abilities, American Frame suffered a cyber-security incident in April 2022 wherein the intruder had the ability to create an unauthorized administrator user with full administrative privileges ("Security Incident").

50. This Security Incident occurred because of Human Element's misconduct, breach of the MSA, and negligence. Beginning in January 2022, American Frame had further engaged Human Element for security monitoring and maintenance because American Frame's technology officer exited the company in December and subsequently joined Human Element as an employee. Security Addendum to the MSA attached as Exhibit I.

51. Despite its obligation to monitor the security of American Frame's Website, Human Element did not even detect the breach, neither when it occurred or anytime thereafter. Instead, the incident was discovered by American Frame.

52. It was ultimately revealed that Human Element did not have a Content Security Policy ("CSP") enabled at the time of the incident. A CSP is a security standard that provides an additional layer of protection from cross-site scripting (XSS), clickjacking, and other code injection attacks. Human Element has made various excuses as to why the CSP was not enabled, but in the end it is clear that Human Element did not adequately equip the American Frame website to prevent cyber-incidents and that Human Element was further incapable of neutralizing the threat once it was uncovered and taking remedial measures.

53. Following the Security Incident, American Frame requested basic information from Human Element regarding how security patches are implemented on the American Frame Website. Despite repeated requests from American Frame since the Security Incident until the filing of this Complaint, Human Element has failed to answer American Frame's questions regarding security patch implementation, calling into question Human Element's ability to properly secure the American Frame Website.

E. **American Frame Has Been Damaged By Human Element's Misconduct, Breach and Negligence.**

54. As a result of Human Element's breaches and misrepresentations, the American Frame Website launched in a defective state. Human Element's attempts over the past year to "rework" and "fix" the site that it built have proven unsuccessful and costly for American Frame.

55. The new site that American Frame contracted Human Element to build has required reworks and fixes of issues that never should have been present in a properly responsive delivered site in the first instance. American Frame estimates the cost to fix basic coding and shipping issues caused by Human Element's conduct to be at least $120,000, and the estimated cost to fix FrameBuilder to be at least $50,000.

56. Human Element's conduct has resulted in more than $385,000 of budget overruns that were not approved by American Frame via Change Request, as required under the MSA.

57. American Frame also incurred approximately $166,000 in additional state sales tax liability due to Human Element's delays and inability to implement to proper software in a timely manner.

58. Human Element's significant cost overruns put American Frame beyond its debt coverage requirements with its banking partner, resulting in considerable harm to its banking relationship beginning in July 2021, restrictions on its borrowing capacity, and increased scrutiny, ultimately resulting in $350,000 of financing revoked.

59. The American Frame Website functionality and performance issues have resulted in negative customer interactions, order cancellations and losses, significant and irreparable losses in SEO rankings—down more than fifty percent from American Frame's old site platform.

60. The performance issues with the American Frame Website causing significant and sustained web-traffic loss caused by Human Element's conduct has resulted in a significant decline

13

in American Frame's revenue at a time when the industry as a whole has grown by as much as 20 percent.

61. The Security Incident related to Human Element's failure to properly equip American Frame's Website resulted in an addition bill from Human Element of $15,000 in addition to reparation work by American Frame's IT team.

62. Each of the aforementioned harms to American Frame is directly attributable to and proximately caused by Human Element's misconduct, breach of the MSA, and negligence.

## **COUNT I – Fraudulent Inducement**

63. Paragraphs 1-62 are incorporated herein by reference as though set forth in their entirety.

64. As set forth above, Human Element represented to American Frame that Human Element had substantial experience in eCommerce website design and development, particularly in Adobe eCommerce (Magento), and that Human Element had the experience and expertise to competently develop a responsive "next level" website for American Frame that would improve overall traffic, conversion rate and overall revenue.

65. These representations were false. Human Element was not able to deliver a responsive website for American Frame in the time frame promised, and even when the site launched a year later it was replete with performance issues and bugs that Human Element has been unable to address, resulting in decreased traffic, decreased sales, and a decline in revenue.

66. Human Element knew these representations were false as it was aware of its own experiences and abilities.

67. Human Element made these representations with the intent that American Frame rely on them and enter into a nearly half-million dollar MSA with Human Element.

68. American Frame did, in fact, rely on these representations in entering into the MSA.

69. American Frame did not know these representations were false at the time it entered into the MSA.

70. These representations were material to American Frame contracting with Human Element for the design and development of its website.

71. As a direct and proximate result of Human Element's fraudulent inducement, American Frame has been damaged in an amount to be proven at trial, but in no event less than $500,000.

72. American Frame is entitled to an award of punitive damages because, on information and belief, Human Element fraudulently induced American Frame to enter into the MSA to serve its own interests, knowing or having reason to know and consciously disregarding the substantial risk that its conduct might significantly injury American Frame.

**COUNT II – Negligent Misrepresentation (In the Alternative)**

73. Paragraphs 1-72 are incorporated herein by reference as though set forth in their entirety.

74. In the course of their business and in a transaction in which they had financial interest, Human Element represented to American Frame that Human Element had substantial experience in the type of eCommerce website design and development required by American Frame, and that Human Element had the experience and expertise to competently develop a responsive eCommerce website for American Frame.

75. These representations were false. Human Element was not able to deliver a responsive website for American Frame in the time frame promised, and even when the site

15

launched a year later it was replete with performance issues and bugs that Human Element has been unable to address.

76. These representations were material to American Frame contracting with Human Element for the design and development of its website.

77. American Frame relied on these representations in entering into the MSA.

78. In the alternative, if Human Element did not know the representations were false or did not intend for American Frame to rely on them, then they nonetheless failed to exercise reasonable care or competence in communicating the information to American Frame.

79. As a direct and proximate result of Human Element's negligent misrepresentations, American Frame has been damaged in an amount to be proven at trial.

## **COUNT III – Breach of Contract**

80. Paragraphs 1-79 are incorporated herein by reference as though set forth in their entirety.

81. Human Element entered into a valid and enforceable Master Services Agreement and amendments thereto with American Frame ("MSA").

82. American Frame performed all obligations and/or conditions precedent to the enforcement of the MSA.

83. Human Element has materially breached the MSA by failing to design and develop the website pursuant to the terms and requirements of the MSA.

84. As a direct and proximate result of Human Element's contractual breaches, American Frame has been damaged in an amount to be proven at trial.

### **COUNT IV – Violation of Ohio Deceptive Trade Practices Act**
### **R.C. 4165.01,** *et seq.*

85. Paragraphs 1-84 are incorporated herein by reference as though set forth in their entirety.

86. By falsely representing itself as having certain "skills and expertise," as well as its false representations that it would deliver a website with certain performance standards, Human Element's conduct as alleged herein constitutes deceptive trade practices under the Ohio Deceptive Trade Practices Act, R.C. § 4165.02(A)(7), (9).

87. As a direct, proximate and foreseeable result of Human Element's violation of the Ohio Deceptive Trade Practices Act, American Frame has suffered damages, and under R.C. § 4165.03, is entitled to an award of damages and attorneys' fees where Human Element's conduct was willful.

### **PRAYER FOR RELIEF**

WHEREFORE, American Frame respectfully prays for judgment against Defendant as follows:

A. Declare that Defendant Human Element breached the MSA;

B. Award damages in an amount to be determined at trial and issue judgment in American Frame's favor against Defendant Human Element;

C. Award American Frame consequential damages and lost profits suffered as a result of Defendant Human Element's misrepresentations and breach of the implied covenant of good faith and fair dealing;

D. Award punitive and exemplary damages sufficient to punish Human Element and to deter them and other likeminded companies from future similar conduct;

E. Award American Frame its attorneys' fees under R.C. § 4165.03(B);

F. Award American Frame its costs, expenses, pre- and post-judgment interest at the maximum rate as permitted by law; and

G. Award any and all relief not here enumerated that this Court deems just and equitable.

Respectfully submitted,

Dated:  July 11, 2022

*/s/ Mark D. Wagoner, Jr.*
Mark D. Wagoner, Jr. (0068577)
SHUMAKER, LOOP & KENDRICK, LLP
1000 Jackson Street
Toledo, Ohio 43604
Telephone: (419) 241-9000
Facsimile:  (419) 241-6894
E-Mail:  mwagoner@shumaker.com

Attorneys for Plaintiff
American Frame Corporation

## JURY DEMAND

American Frame hereby requests that all triable issues of fact be brought before a jury.

*/s/ Mark D. Wagoner, Jr.*
Mark D. Wagoner, Jr. (0068577)
SHUMAKER, LOOP & KENDRICK, LLP

Attorneys for Plaintiff
American Frame Corporation